IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Tracy L. Redding,                                  :
                        Plaintiff                  :        Civil Action 2:10-cv-00082

            v.                                     :        Judge Graham

Michael J. Astrue,                                 :        Magistrate Judge Abel
Commissioner of Social Security,
                        Defendant                  :

### REPORT AND RECOMMENDATION

Plaintiff Tracy L. Redding brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his application for  Social Security Disability Insurance benefits.  This matter is before the  Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.**

Plaintiff Tracy Redding maintains he became disabled at age 34 by mental retardation, Brugada syndrome, and degenerative disc disease of the lumbar spine. The administrative law judge found that Redding functions within the borderline range of intelligence and that he retains the ability to perform a reduced range of work having sedentary exertional demands. The work could involve simple repetitive tasks that are not fast paced and do not have strict time limitations or high production quotas.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge erred in concluding that Redding's impairments did not meet or equal Listing 12.05;
- The administrative law judge failed to consider the medical expert's testimony in its entirety;
- The administrative law judge failed to consider Dr. Hasan's opinion in its entirety; and,
- In the alternative, Redding seeks remand pursuant to sentence six of 42 U.S.C. § 405(g).

**Procedural History.**  Plaintiff Tracy L. Redding filed his application for disability insurance benefits on October 31, 2006, alleging that he became disabled on August 16, 2006, at age 34, by heart problems.  (R. 165-73, 184.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On July 16, 2009 an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 52-94.)  A vocational expert and a medical advisor also testified.  On August 13, 2009, the administrative law judge issued a decision finding that Redding was not disabled within the meaning of the Act.  (R. 109.)  On November 30, 2009, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 1-5.)

**Age, Education, and Work Experience.**  Tracy L. Redding was born February 14, 1972.   (R. 165.) Although eligible for special education classes, Redding attended regular classes. He was retained in the third grade. (R. 293.) When he began high school, Redding was given an IEP. (R. 294 and 297-98.) He completed the tenth grade.  (R. 189.)

He has worked as a forklift operator and a general laborer.  He last worked August 16, 2006.  (R. 191.)

**Plaintiff's Testimony.**

Redding lives with his wife, children and his in-laws. He completed the tenth grade. He testified that he could write a simple note and count change. He worked from September 1998 to August 2006 as a forklift operator, which also included significant manual lifting. He also worked from 1993 to 1997 as a janitor. (R. 185.)

After receiving a pacemaker, he began experiencing pain in his back and legs. He also began having memory loss. While at the emergency room, he was told that feeling like his heart was racing was normal, but it did not feel normal to him. When the weakness began in his legs, he could walk for a little bit before needing to stop. His legs would become numb and start tingling. He attempted physical therapy, but it did not provide him with relief. He has been using a walker for the past two months because his legs would just give out on him.

Redding testified that he began experiencing back pain about six years ago following an accident in which he fell eleven feet onto concrete. His memory loss has been attributed to his head hitting the concrete. He testified that he experienced sharp pain in his back all the time. He has undergone three injections, but they have not provided him with relief.

Redding also testified that he experienced symptoms of dizziness or lightheadedness off and on, although it was not as bad as it used to be. He had these

symptoms three to four time per month. The symptoms would last two to three minutes, and afterwards he felt tired and weak.

With respect to his heart, he reported episodes of his heart racing while he was asleep. He would wake up and feel as though his defibrillator was about to go off. He would remain awake for about two or three hours afterwards. He also had chest pain about two or three days out of each week. It felt like someone was pushing on his chest and would last four or five minutes. He also experienced shooting pain down his arm and his neck.

Redding testified that he was most comfortable laying down.  As for housework, Redding helped with dishes, swept, and folded laundry, although his wife did the majority of the work. He drove, although he was not supposed to because of his problems with his memory and episodes of lightheadedness, but his wife did not have her driver's license.

He occasionally played cards with his family. He also spent time on the computer and watched sports on television.  He denied drinking alcohol, although he acknowledged he did in the past. He stopped drinking when he got married and had children.

Without a walker, Redding could be on his feet for about a half hour. He could only sit for about an hour.  He could lift up to five or ten pounds without difficulty. (R. 60-80.)

4

**Medical Evidence of Record.**  This Report and Recommendation will briefly summarize the relevant medical evidence of record.

**Physical Impairments.**

Adena Health System.  On March 5, 2006, plaintiff presented at the emergency room with complaints of right flank pain with pain radiating down into his right leg. (R. 529-30.)

On August 10, 2006, Redding was treated at the emergency room for a left rib injury. (R. 398-400.) On August 16, 2006, Redding was treated at the emergency room for acute sinusitis with pyrexia. (R. 395-96.)

On August 18, 2006, Redding was admitted to the hospital for lower extremity and partial upper extremity weakness possibly the result of an atypical reaction to a viral infection or sinusitis. A neurology consultant considered the inconsistencies in Redding's reported symptoms and the subsequent physical examination to be of such magnitude that he found Redding not credible.  (R. 380-81.)  The emergency room doctor speculated whether he had Guillian Barre syndrome because of a recent viral illness or possibly a spinal cord injury. (R. 383.) Redding underwent a lumbar puncture. (R. 385.) Physical examination was not consistent with Guillian-Barre syndrome. Aseptic meningitis was considered. (R. 387.)

An August 18, 2006 MRI of Redding's lumbar spine showed that the disk spaces were well maintained. There was a mild degree of disk degeneration at the L5-S1 level.

5

There was no evidence of herniated nucleus pulposus or cord compression. The lateral recesses were patent bilaterally. (R. 392.)

On September 13, 2006, plaintiff was brought to the emergency room via squad for a reported seizure. Although he presented with tremors and hyperventilation, his symptoms did not appear consistent with a seizure. A viral syndrome was suspected. (R. 374-76.)

On September 24, 2006, Redding presented at the emergency room with complaints of chest pressure, shortness of breath, left arm and left shoulder pain. He reported that a few weeks ago he developed subacute onset of imbalance, difficulty walking, fatigue and shortness of breath. An ECG suggested borderline ST changes in VI, V2. He did not appear to be having an acute event and was referred to the cardiac catheterization laboratory. (R. 352-58.)

On October 14, 2006, Redding was treated at the emergency room for chest pain. It was believed that the chest pain was non-cardiac in nature. Redding was given Vicodin and discharged. (R. 346-47.)  On November 25, 2006, Redding presented at the emergency room complaining of defibrillator discharge. He was diagnosed with cardiac dysrhythmia and transferred to Ohio State University Medical Center.  (R. 339-40.)

On January 10, 2007, Redding presented at the emergency room with complaints of chest pain. The pain was sharp and stabbing and radiated towards his right axilla. The source of the pain was believed to be musculoskeletal rather than cardiac.  (R. 549-51.)

6

Berger Hospital. On August 17, 2006, Redding presented at the emergency room with complaints of swelling and pain in his arm and leg. He was diagnosed with myaligia of unknown etiology and discharged with instructions to follow up with his family doctor. (R. 321-23.)

Ayesah K. Hasan, M.D. On September 7, 2006, Dr. Hasan began treating Redding following the discovery of Brugada syndrome symptoms on an abnormal EKG. (R. 407-08.) In an October 27, 2006 letter, Dr. Hasan noted that a September 22nd electrophysiology study revealed inducible and reproducible ventricular tachycardia which degenerated to polymorphic ventricular tachycardia.  Redding underwent a dual chamber ICD placement. She noted that Redding had been doing very well from a cardiac standpoint. (R. 410-11.)  Although Redding complained of some paresthesias and weakness in his lower extremities, he had no abnormalities in a neurology work-up. His cardiovascular examination was also normal. (R. 446-47.)

In a May 3, 2007, letter, Dr. Hasan noted that Redding had experienced intermittent symptoms of non-specific chest pain with negative stress testing. Interrogation of his ICD revealed frequent episodes of nonsustained ventricular tachycardia and one episode of anti-tachycardia pacing for sustained VT. Redding complained of intermittent palpitations. (R. 761-62.)

In an August 14, 2007 letter, Dr. Hasan reported that plaintiff had been doing well despite having recent palpitations. In a July 2007 emergency room visit, his heart rate reached 150 beats per minute, but he did not have a shock form his ICD. He had

had no syncopal episodes, nausea, or vomiting. He experienced lower extremity paresthesias. (R. 759-60.)

On January 4, 2008, Dr. Hasan noted that Redding continued to complain of lower extremity paresthesias and weakness. (R. 755-57.) Physical therapy had not provide him with relief. (R. 756.)

On May 22, 2008, Dr. Hasan completed a cardiac residual functional capacity questionnaire. (R. 643-48.) Plaintiff was diagnosed with Brugada syndrome. He was in class I-II under the New York Heart Association functional classification. Redding experienced palpitations and weakness in his lower extremities. In response to the question, "is your patient a malingerer?" Dr. Hasan circled "no" with a notation that states "uncertain–he could be". (R. 644.) Dr. Hasan indicated that Redding could tolerate moderate work stress.  He opined that the degree to which Redding's cardiac symptoms could interfere with his attention and concentration varied from seldom to often. Redding's prognosis was good. Dr. Hasan opined that Redding could walk three to four city blocks before needing a rest; sit for more than two hours before needing to get up; and stand for 30-45 minutes before needing to sit down or walk around. Redding required a job that permitted shifting positions at will and allow unscheduled breaks every three to four hours for 10-15 minutes at a time. In a sedentary job, Redding would require his legs to be elevated 5-10% of the time. (R. 646.)

Dr. Hasan opined that plaintiff could frequently lift and carry ten pounds, occasionally lift 20 pounds, and rarely lift 50 pounds. He could lift no more than 50

8

pounds. Redding could twist, stoop, crouch somewhere between rarely and occasionally. He could never climb ladders and only occasionally climb stairs. Redding should avoid concentrated exposure to extreme cold or heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (R. 647.) Dr. Hasan also opined that Redding would have both good days and bad days. He was likely to be absent from work about one day per month. (R. 648.)

On January 22, 2009, Dr. Hasan noted a reduced ejection fraction of 45%. (R. 928.)

Anton Freihofner, M.D. On January 9, 2007, Dr. Freihofner completed a physical residual functional capacity assessment. (R. 417-24.) Dr. Freihofner concluded that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds. He could stand, walk, or sit about 6 hours in an eight hour day.  Redding was unlimited in his ability to push or pull. Dr. Freihofner noted that Redding's defibrillator went off when he was doing light work, but all physical findings were within normal limits.

Dr. Freihofner noted that plaintiff should never climb ladders, ropes or scaffolds and that he should avoid hazards like machinery and heights. He should also avoid all exposure to large magnetic fields or arc welding equipment. Dr. Freihofner opined that plaintiff's allegations concerning the severity of his symptoms were partially consistent with the evidence of record.

Charles J. Love, M.D. In an October 25, 2006 letter, Charles J. Love, M.D., the Directory of Arrhythmia Device Services, informed Redding's employer that Redding should not return to his current position based on the need to repeatedly lift up to 50

9

pounds at a time, the elevated heights at which he was expected to work, and the proximity to high energy electrical devices, which could affect the operation of his device. (R. 409.)

On November 25-26, 2006, Dr. Love treated plaintiff as a patient at the hospital. Plaintiff was admitted based on his complaints of four discharges of his ICD. Dr. Love interrogated the device and concluded that plaintiff had sinus tachycardia. This occurred while Redding was working in the yard performing some rather heavy work with a wheelbarrow. Dr. Love adjusted his medications and the device. (R. 503.)

Ohio State University Medical Center. On August 21, 2006, a MRI of Redding's lumbar spine revealed mild degenerative disk disease at L5-S1 with no significant central canal or neural foraminal stenosis. (R. 470-71.) An August 21, 2006 MRI of Redding's cervical spine showed multilevel degenerative change of the cervical spine with mild central canal stenosis at C3-4 and C6-7. (R. 471-72.)

On October 17, 2010, Redding presented at the emergency room with continued complaints of pain around his pacemaker site.  He complained of occasional dizziness, but he had no shortness of breath or nausea. (R. 432.) The emergency room doctor noted that a full pacer interrogation was recently performed, and it was normal. (R. 433.)

Redding was admitted to the hospital for complaints of bilateral leg weakness and dysesthesias. (R. 436-37.) At the time he was admitted, he could not walk, but Redding had remarkable improvement in his functional abilities during his stay. Physical and occupational therapists were reportedly "not impressed with his deficits."

(R. 436.) Redding was able to walk on his own despite his complaints of abdominal pain, leg weakness, and loss of sensation. *Id.*

On August 22, 2006, Redding underwent an EMG to evaluate numbness and weakness in his legs. The results were normal. (R. 508-09.)

On September 13, 2006, Redding was treated for complaints of seizure activity and syncope. (R. 440). Redding had difficulty breathing and was hyperventilating. He became unconscious and had seizure-like activity. He also continued to experience severe weakness with paresthesias of the lower extremities. The seizure activity was found to be secondary to the hyperventilation. (R. 440-43, 470.)

On September 15, 2006, Redding was examined for complaints of dysuria and pelvic pain. He complained of generalized weakness, low back pain, and dizziness. (R. 1050–52.)

On December 13, 2006, Redding presented at the emergency room with complaints of chest pain with radiating pain into his left arm and left leg. He also complained of feeling a charge going through his chest to his arm. (R. 490.) On December 14, 2006, he denied having chest pain, but he complained that his arm had been swollen the day before, but it had resolved. (R. 491.)

On February 5, 2007, plaintiff reported feeling weak, lightheaded, dizzy, and feeling as though he would pass out. He also reported chest pain and side and back pain. (R. 483.) On February 19, 2007, plaintiff was seen for follow up care of his chest pain and fatigue. (R. 482.)

On May 1, 2007, Redding presented at the emergency room with complaints of chest pain and weakness. (R. 851-56.) He identified his pain as an 8 on a scale of 1 to 10. He reported ongoing lightheadedness. He described his chest pain as sharp and intermittent. The pain radiated into his back and right arm. (R. 855.)

On July 5, 2008, Redding was treated for a spinal headache that was the result of a myelogram. (R. 834-840.)

James E. Lundeen, Sr., M.D. In a March 14, 2007 letter, Dr. Lundeen summarized his examination of Redding on March 9, 2007. (R. 595-97.) Redding was injured in an industrial accident on March 8, 1998 when he fell eleven feet from a platform and landed on concrete. Dr. Lundeen indicated that plaintiff had difficulty lifting and carrying objects, working in the yard, and feeding animals as a result of his injury. Plaintiff also experienced headaches as a result of a concussion brief coma.

A examination of Redding's lumbar, lumbosacral and sacral spine revealed 3 degrees of extension, 5 degrees of left lateral flexion, and ten degrees of right lateral flexion. (R. 597.)

Dr. Lundeen also examined Redding to evaluate the injury Redding sustained when his hand was caught in a machine at work. Dr. Lundeen opined that the permanent partial impairment for this injury was 16% of the whole person. (R. 598-600.)

Mary Ann Wynd, M.D. On April 18, 2007, Dr. Wynd evaluated Redding for his injuries that he sustained when he fell ll feet onto concrete. Redding reported that since

that time, he had had chronic back pain, pain in his lower extremities, chest discomfort, memory loss, headaches, and dizziness.

On physical examination, Redding was alert and appropriate, although he had some difficulty answering some questions. Fundi demonstrate flat disks. Cranial nerves II-XII were intact. He had tenderness to palpation in the anterior right chest as well as in the thoracolumbar region of his back. He had left upper extremity mild weakness. Deep tendon reflexes were 2+ bilateral biceps and 2+ bilateral triceps. Grip strength was decreased on the left. He had normal sensation to touch on the lower extremities, but he complained of tingling in his feet. Deep tendon reflexes were 1+ bilateral patellar and 1+ bilateral Achilles. Clonus was negative. Bent leg raise demonstrated pain in both legs and calves. Lumbosacral range of motion was slightly decreased. He had some difficulty extending his arms overhead, toe and heel walking, and performing a half squat.  He also had some difficulty walking in a straight line. He was able to perform cerebellar function tests, including rapid hand movement and eye to nose finger coordination. (R. 763.)  Dr. Wynd requested neuropsychological testing to determine if his 1998 injury was affecting his cognitive abilities. (R. 764.)

Howard R. Rothbaum, M.D. On October 16, 2006, Dr. Rothbaum, a family physician, began treating plaintiff. (R. 691-92.) Redding complained of weak legs, dizziness, and chest pain. Dr. Rothbaum diagnosed Brugada syndrome and chest pain of unknown etiology. (R. 692.) On April 1, 2008, Dr. Rothbaum examined plaintiff.

Plaintiff complained of persistent back pain, which had worsened since starting physical therapy. (R. 653.)

On December 1, 2006, Redding reported difficulty driving because of nerve deficits. (R. 687.) On February 5, 2007, Redding complained of weakness, dizziness, fainting, and pain in his chest, side and back. (R. 604-07, 685-86.) On February 19, 2007, Redding reported that his symptoms were worse. (R. 602.)

On April 17, 2007, Redding reported leg weakness and dizziness. (R. 679-81.) On May 24, 2007, Redding complained of weakness in both legs and lower back pain. (R. 675-76.) On June 8, 2007, Redding complained of back pain, diarrhea, racing heart, and numbness in his legs. (R. 673-74.)  On June 22, 2007, Redding reported abnormal chest palpitations, possibly the result of his medication. (R. 671-72.) On August 8, 2007, Redding complained of swelling in his right leg. (R. 667-68.)

On August 26, 2008, Redding reported that Dr. Severyn would no longer be treating him because there was nothing further that he could do. Redding complained of chronic back pain. His wife reported that he had been exhibiting problems with his memory. (R. 904.)

On January 20, 2009, Redding reported he may have blacked out. He also reported seeing a spider that his daughter did not see. (R. 914.)  On March 5, 2009, Redding reported that he begun urinating in the bed at night. Dr. Rothbaum diagnosed mood disorder, GERD, Brugada syndrome, neuraliga, low back, side and neck pain. (R. 942.) Dr. Rothman referred him for neurology and urology testing. (R. 945-46.) On April

14, 2009, Redding reported that his memory loss was getting worse. He also reported

increased weakness in his legs that caused him to fall down. (R. 936.) On April 16, 2009,

Redding was prescribed a disability placard for his car. (R. 1025.)

     <u>Steven A. Severyn, M.D.</u> On June 6, 2008, plaintiff reported to Dr Severyn that his

pain was poorly controlled. Dr. Severyn planned to perform a diskography to identify

the degree to which any given lumbar disk was contributing to his pain. (R. 770-71.) Dr.

Severyn performed a series of lumbar interlaminar steroid injections.

     In a January 30, 2008 letter, Dr. Severyn noted that his findings were consistent

with right-sided S1 lumbar radiculitis and probable L5-S1 disk displacement with right-

sided lumbar strain. (R. 795.)

     On August 8, 2008, Dr. Severyn noted that the series of epidural steroid injections

had not provided Redding with any relief. (R. 906.)

     On August 28, 2008, Dr. Severyn examined plaintiff. Redding continued to

experience lumbar pain. Redding had forward flexion limited to 45 degrees and

posterior extension painful at 20 degrees. Reflexes were intact. Motor and sensory

function were normal in the lower extremities. Dr. Severyn referred him to physical

therapy although Redding reported that past physical therapy had been ineffective. (R.

903.)

     **<u>Psychological Impairments.</u>**

     <u>School Records.</u> On March 10, 1981, Redding underwent IQ testing at school. He

achieved a verbal IQ score of 59, performance IQ score of 52, and a full scale IQ score of

52. (R. 281.) Report cards showed that Redding received many Ds and Fs, although he received As and Bs in physical education. In math, he earned Cs and Bs. (R. 286.) School records indicated that Redding did not hear sounds correctly. (R. 288.) A teacher stated that he frequently misunderstood what she said. *Id.* Later records indicate that in 1988 Redding had corrective surgery for his hearing problems. (R. 293-94.) As a sixth grader, a teacher reported that he read below grade level, which presented a problem for him in social studies and science in which he got Fs. He was considered handicapped and identified as having a learning disability. (R. 289.)

At the end of March and in April 1989, at the end of his tenth grade school year, Reading underwent testing to determine his needs for an individual education plan ("IEP"). He was then 17 years old. On the Slosson Intelligence Test, he scored a 63 (1st percentile). His mental age was 10-10. The evaluation team report said those scores were comparable to previous psychological indicators. (R. 293.)

On the Kaufman Test of Educational Achievement (KTEA), Redding's math application score was at the 8.1 grade level (21st percentile). His reading/decoding was at the 6.2 grade level (5th percentile). His spelling was at the 7.5 grade level (14th percentile). His reading comprehension was at the 4.1 grade level (1st percentile). His math computation was at the 10.2 grade level (32nd percentile). (R. 293 and 301.)

The evaluation team report said that Redding's vocabulary was limited. His PPVT-R score was 62 (1st percentile). His expressive vocabulary appeared to be commensurate with his IQ. His social quotient was 62. He had low communication,

16

with a score of 47 (below 1st percentile). His daily living score was 81  (10th percentile).
His socialization score was 75  (5th percentile). (R. 293.)

The April 1989 report said that Redding was then failing at least two courses. He
was passing math. *Id.* It was recommended that he begin special education classes as
soon as possible. A conference was scheduled with his parents to develop an IEP.
Developmentally handicapped placements were recommended for English, social
studies, health and adaptive behavior. (R. 294.)

A report from the school psychologist, Stephanie Neff Metzger, indicated that
Redding had displayed behavioral changes during the past few months. He was
suspended from school for inappropriate behavior on the school bus. The high school
principal was concerned that Redding might be acting out as a result of frustration in
school. (R. 302.)

Ms. Metzger's report indicates that in first grade Redding was experiencing gross
motor difficulties and underwent neurological evaluation at Children's Hospital. The
school psychologist administered the Stanford Binet Intelligence Scale, Form L-M and
found that Redding was functioning in the 70 to 80 IQ range. *Id.*

When he was nine years old, a school psychologist administered the WISC-R and
Redding scored in the educable mentally retarded range, with a verbal score of 59, a
nonverbal score of 52, and a full-scale IQ of 52. An educable mentally retarded class was
recommended, with possible regular class placement for math. Redding's parent did
not agree to the placement, and he remained in regular classes. *Id.*

Redding's sixth grade teacher recommended evaluation, but his parents did not give their permission. *Id.*

When he was evaluated by Ms. Metzger, Redding knew his address, birthday and telephone number. He said that he was working every day after school. He drove a car. His speech was intelligible. (R. 303.)

Ms. Metzger said that Redding's Slosson Intelligence Test score was "within the 'developmentally handicapped' range of ability and surpasses approximately 1% of the scores of age mates." *Id.* That score was consistent with past evaluations. He had weaknesses in general information, short-term memory, rote memory, and vocabulary development. He had "relatively strong math reasoning ability and knowledge of measurement." *Id.*

Redding's Peabody Picture Vocabulary Test-Revised (PPVT-R) score was the age equivalent of nine years, four months. His receptive vocabulary score on the test was consistent with his Slosson IQ score and supported a finding that Redding was functioning within the developmentally handicapped range of ability. *Id.*

The Vineland Adaptive Behavior Scale interview demonstrated deficits in communication and socialization. His communication skills were below the first percentile. Socialization skills were moderately low. His daily living skills were moderately low but exceeded 10% of age mates. *Id.*

Patricia Semmelman, Ph.D. On April 16, 2007, Dr. Semmelman was asked whether the agency could use the results of the Slossen IQ test that plaintiff took at age

18

17. Dr. Semmelman responded that the Slosson test results were not acceptable and that his score of 63 was out of line with his academic scores and the Vineland test results. She indicated that a consultative evaluation with IQ testing, WRAT and MQ was necessary. (R. 514-15.)

On June 2, 2007, Dr. Semmelman completed a mental residual functional capacity assessment. (R. 609-12.) With respect to understanding and memory, Dr. Semmelman concluded that Redding was moderately limited in his ability to understand and remember detailed instructions. With respect to sustained concentration, Redding had moderate limitations in his abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Redding had no significant limitations in the category of social interaction. With respect to adaptation, Redding was moderately limited in his abilities to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. 609-10.)

Dr. Semmelman gave a fairly lengthy narrative explanation for her residual functional capacity assessment. Based on her reading of the IQ and other test results and Redding's history of substantial gainful work, she concluded that he appeared to functioning in the borderline range rather than mental retardation range of intellectual functioning. She noted that physical disabilities were the only reason Redding said he

19

he had for leaving work. Dr. Semmelman recognized that Redding had a history of disability handicapped classes and that his IQ readings in school were in the 50s and low 60s. She also acknowledged that Dr. Tanley reported a verbal IQ of 66, performance IQ of 72, and full scale IQ of 66. She pointed out that although Redding's WRAT-4 reading was nearly ninth grade, his comprehension fifth grade, and his math high school level, he scored only 4 on the WAIS-R math subtest. Given his math test scores, she did not find credible his assertion that he could not count change. (R. 611.)

Dr. Semmelman found it was unclear why the IQ testing resulted in much lower scores than the academic testing. She noted that Redding could care for his own personal needs. He said that before his physical impairments "he could do 'anything and everything on my own.'" *Id.* She concluded based on his testimony, WRAT-4 scores for word reading, spelling and math, his long history of substantial gainful employment (earning $19,000 to $27,000 a year) that Redding appeared to be functioning more in the borderline than mentally retarded range. She said that overall plaintiff's adaptive functioning "is much more in line with that of his academic scores and therefore the clt is not MR." *Id.* In Dr. Semmelman's opinion, Redding "retains the capacity for one and two step tasks in a routine setting without strict time constraints or production quotas." *Id.* Due to inconsistencies in information provided by Redding, Dr. Semmelman found that his statements of symptoms and limitations were only partially credible. (R. 611.)

James C. Tanley, Ph.D. On May 11, 2007, Dr. Tanley, a clinical psychologist, completed a disability assessment report at the request of the Bureau of Disability

Determination. (R. 588-91.) He completed the tenth grade in regular education classes, but records indicate that he was eligible for developmentally handicapped classes. He stopped attending school because he did not want to go anymore.

On mental status examination, Redding was cooperative and exhibited eccentricities of manner, impulsivity, or compulsivity. He did not appear to minimize or exaggerate his symptoms. His thoughts were coherent, relevant, and goal-oriented. Redding was alert and oriented in all four spheres. His recent and remote memory were superficial to poor. Cognitive efforts ranged from low average to mental retardation, with most in the ranges above mental retardation. He remembered five digits forward and four backwards. Dr. Tanley indicated that his judgment was impaired with respect to making important life decisions and conducting his own living arrangements.

Redding described his daily activities geting up about 9:00 and helping around the house a little bit. If he did too much, his heart would begin to race, but he could fold laundry or do some dishes. He liked to go fishing. (R. 589.)

Redding's scores on the WAIS-III place him in the mild range of mental retardation. His scores ranged from low average to mental retardation. He achieved a verbal IQ score of 66, a performance IQ score of 72, and a full scale IQ score of 66. (R. 590.) He appeared to put forth sincere effort, and the results correlated well with records sent from the Bureau of Disability Determination showing scores of VIQ =59, PIQ = 52, and FSIQ =52 on the Weschler IQ. At the time of those scores, Redding was

functioning in the "educable mentally retarded range." Dr. Tanley concluded that the diagnosis of mild mental retardation appeared appropriate for Redding. (R. 590.)

WRAT-4 testing showed Redding's word reading at the 8.9 grade level (16th percentile). His sentence comprehension was at the 5.1 grade level (2nd percentile). Spelling was at the 6.7 grade level (12th percentile). His math computation was at the 12.4 grade level (45th percentile). His reading composite was in the 5th percentile. (R. 590.)

With respect to work-related abilities, Dr. Tanley concluded that Redding was mildly impaired in his ability to relate to others based on his apparent lack of knowledge. He was moderately impaired in his ability to understand and follow simple instructions. He was at least mildly impaired in his ability to maintain attention to perform simple, repetitive tasks. He was severely impaired in his ability to withstand the stress and pressure of daily work based on a chronic adjustment disorder with depressed mood and mild mental retardation. He was assigned a Global Assessment of Functioning score of 50. (R. 591.)

**Testimony of Medical Expert**. Jonathan W. Nusbaum, M.D., testified at the hearing as a medical expert. (R. 80-85.) Dr. Nusbaum testified that the record supported diagnoses of Brugada syndrome and degenerative disk disease of the lumbar spine. (R. 82-83.) Weakness of the lower extremities was also documented, although the etiology of that weakness was not clear. Dr. Nusbaum noted that there were at least four references to falls in the emergency room treatment notes. He believed that there was

22

adequate objective support to demonstrate that Redding had weakness in his legs based on his use of the cane and recently being issued a walker. (R. 84.)

Dr. Nusbaum testified that he believed plaintiff met the requirements of Listing 12.05C based on his IQ scores of 66 and his difficulty ambulating. (R. 83.)

Dr. Nusbaum further testified that Redding would be limited to lifting ten pounds occasionally and five pounds frequently. He had no limitation with respect to sitting. Standing and/or walking would be limited to 15 minutes at a time with nor more than two hours in an eight hour day. Because he used a walker, he would not be able to carry anything. Stooping, squatting, crouching, ladders, heights, stairs, and unprotected heights would all be precluded. Working around hazardous machinery, driving, or working overhead would also be precluded. (R. 85.)

### Administrative Law Judge's Findings.

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2012 (Exhibit 4D, p.1).

2.  The claimant has not engaged in substantial gainful activity since August 16, 2006, his alleged onset date of disability (20 CFR 40.1571 *et seq.*).

3.  The claimant has the following severe impairments: borderline intellectual functioning, adjustment disorder, Brugada syndrome, and degenerative disc disease of his lumbar spine (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.     The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1565(a), subject to the following: (1) no lifting of greater than five pounds frequently or ten pounds occasionally; (2) no standing and/or walking for longer than 15 minutes at a time or two hours total in a workday; (3) no carrying, stooping, squatting, crouching, or climbing; (4) no work at unprotected heights or around hazardous machinery. From a mental standpoint, he is limited to simple repetitive tasks that are not fast-paced, strict time limited, or high production type tasks. He requires a static environment with minimal changes in routine.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on February 14, 1972, is age 37, and has been defined as a younger individual at all times relevant to this decision (20 CFR 404.1563).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 CFR Part 404. Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 16, 2006 through the date of this decision (20 CFR 404.1520(g)).

(R. 102-09.)

    **Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings

of the Commissioner as to any fact, if supported by substantial evidence, shall be

24

conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge erred in concluding that Redding's impairments did not meet or equal Listing 12.05. At the age of 9, Redding underwent IQ testing at school. He test scores revealed a verbal IQ of 59, a performance IQ of 52, and full scale IQ of 52. As a tenth grader, Redding underwent testing to determine if he was developmentally handicapped. His scores fell within the developmentally handicapped range. His IQ was 63, and his mental age was 10-10. Weaknesses were noted in his scope of general information, short-term

and rate auditory memory, and vocabulary development. The school planned to develop an Individualized Education Plan ("IEP") for him, but Redding left school in the tenth grade.  In May 2007, Redding achieved a verbal IQ of 59, a performance IQ of 72, and a full scale IQ of 66.  The administrative law judge stated that Redding achieved a IQ score of 92, but plaintiff argues that the form reflecting this score does not contain sufficient information to know what test Redding took or what the score meant.  Plaintiff argues that the Dr. Semelman's determination that his IQ test scores were not valid was improper. None of the tests mentioned indicate any reason to believe that the tests were not accurate. Plaintiff insists that his IQ scores are consistent with his academic scores and records. The administrative law judge concluded that plaintiff's actual level of adaptive functioning was inconsistent with the requirements of 12.05C because he had previously earned between $19,000 and $27,000 a year, including semiskilled work as a forklift operator. The administrative law judge also relied on the fact that plaintiff completed his own disability forms, but Redding argues that his wife assisted him in completing the forms. According to plaintiff, the administrative law judge's reliance on Redding's abilities to use a computer and drive a car also does not show that his cognitive level is above mild mental retardation. Redding also argues that the administrative law judge ignored pertinent evidence demonstrating his deficits in adaptive functioning and the conclusions of the consultative examiner, Dr. Tanley.

26

- <u>The administrative law judge failed to consider the medical expert's testimony in its entirety.</u> Dr. Nusbaum testified that Redding's conditions met Listing 12.05C, and he did not understand why Dr. Semmelman considered his IQ tests results to be invalid.  He also testified that Redding's difficulty ambulating would satisfy the other "prong" of Listing 12.05C. The administrative law judge incorrectly stated that Redding's impairments did not meet or equal a listing and that this finding was consistent with Dr. Nusbaum's testimony.

- <u>The administrative law judge failed to consider Dr. Hasan's opinion in its entirety.</u> The administrative law judge failed to take into account the length of the treating relationship and the nature and extent of the relationship. Redding had been treated by Dr. Hasan since August 25, 2006, and he had seen him seven times through May 28, 2009. Dr. Hasan diagnosed plaintiff with Brugada syndrome and conducted extensive examinations, prescribed medication, and ordered further testing. Dr. Hasan's findings were consistent with other substantial evidence in the record. Plaintiff also argues that the administrative law judge failed to give good reasons for failing to adopt Dr. Hasan's opinion. The administrative law judge simply ignored Dr. Hasan's opinion that Redding would need to be able to shift positions at will and would require ten to fifteen minute breaks every three to four hours.

- <u>In the alternative, Redding seeks remand pursuant to sentence six of 42 U.S.C.</u> <u>§ 405(g).</u> Redding was admitted to the hospital on August 15, 2009. The records from his hospital stay were submitted to the Appeals Council, but the documents were not considered or made part of the record. The evidence shows a positive diagnostic test for syncope and provides credibility to Redding's allegations.

**Analysis.**  <u>Mental Retardation</u>. Plaintiff argues that he meets Listing 12.05C, which states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The administrative law judge acknowledged that the record revealed IQ scores below 70, but he concluded that plaintiff's actual level of adaptive functioning was inconsistent with the requirements of §12.05C on the basis of Dr. Semmelman's opinion that his low IQ scores were invalid because they were out of line with academic scores and Vineland test results. The administrative law judge did not credit Dr. Tanley's diagnosis of mild mental retardation because Redding had performed successful work activity for eight to nine years, earning between $19,000 and $27,000 a year, including

28

semiskilled work as a forklift operator. The administrative law judge noted that plaintiff completed his own disability forms, enjoyed using a computer, and maintained a valid driver's license because he was the only person in his family who drove. (R. 104.)

Of course, valid IQ test scores are essential to meet the Listing:

6. *Intelligence tests.*

a. The results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.
b. Standardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered under the provisions of 12.05A.

The results of the Vineland Behavior Scale, on which Dr. Semmelman based her conclusions, at least in part, were summarized in Redding's school records:

Tracy served as his own informant for the administration of the Vineland Adaptive Behavior Scale, Interview Edition. According to his own responses to the questions asked, Tracy demonstrates deficits in the Communication and Socialization Domains, earning scores of 47 and 75 for the two, respectively. Tracy's communication skills fall below the first percentile, and may be described as "low" when he is compared to age peers. Socialization skills are "moderately low" and fall at the 5th percentile. Daily living skills are also described as "moderately low" but exceed those skills of 10% of age mates. Tracy has difficulties expressing ideas in more than one way, does not read on his own volition, and rarely reads newspaper stories. He cannot tell birthdays of immediate family members, and relies on his parents to manage his money and make appointments for him. As noted above, Tracy does work part-time, and does drive a car. He stated that he does watch television for practical day-to-day information, but never does his ow laundry or clean his own room.

(R. 303-04.)

29

The evidence of record shows that Redding scored a verbal IQ score of 66, a performance IQ score of 72, and a full scale IQ score of 66. (R. 590.) Dr. Tanley diagnosed mild mental retardation. Dr. Tanley's narrative report accompanying the test results indicated that his belief that the IQ scores were considered valid and consistent with the developmental history and the degree of functional limitation as demonstrated by earlier test scores.

Plaintiff argues that his abilities to use a computer and drive a car does not necessarily demonstrate that he is not mentally retarded. *See Brown v. Secretary of Health and Human Services*, 948 F.2d 268, 270 (6th Cir. 1991)(finding that claimants ability to use public transportation, maintain a driver's license, visit friends, make change at a grocery store, wash his laundry, clean his room, follow a road atlas, work as a truck driver in addition to completing the sixth grade and having a limited level of reading comprehension is not inconsistent with a diagnosis of mild mental retardation).

However, the administrative law judge concluded that Redding did not exhibit the deficits in adaptive functioning based on the facts that plaintiff had earned between $19,000 and $27,000 a year as a forklift operator. "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Com'r Social Sec. Admin.*,  240 Fed. Appx. 692, 698, 2007 WL 1991059, at *5 (6th Cir.  2007)*(citing Heller v. Doe by Doe*, 509 U.S. 312, 329, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)).  *See also Hayes v. Commissioner of Social Sec.*,  357 Fed. Appx. 672, 677, 2009 WL 4906909, at * 5 (6th Cir. 2009)*(finding that the claimant's adaptive skills were not

30

deficient because she cared for herself and her husband; cooked meals, did laundry, shopped, managed her finances; and took public transportation*); Carmack v. Barnhart*, 147 Fed. Appx. 557, 560-561, 2005 WL 2108329, at *3 (6th Cir. 2005)*(finding that claimant's work history demonstrated her ability to perform complex tasks, and belied her claim of mental retardation, because as owner of a tanning salon she was required to keep the books, manage the business, use an adding machine, and take appointments*); and Daniels v. Commissioner of Social Security*, 70 Fed. Appx. 868, 873, 2003 WL 21774004, at * 5 (6th Cir. 2003)(finding no deficits of adaptive functioning on the basis that the claimant had graduated from high school, earned a cosmetology license, and possesses prior work experience in a movie theater, as a hair stylist, and as a school bus driver). The administrative law judge also noted that plaintiff completed his own disability forms, although Redding indicates that his wife assisted on one form. (R. 241.) Redding testified he helped with dishes, swept, and folded laundry, although his wife did the majority of the work. He also testified that he drove, played cards with his family, spent time on the computer, and watched sports on television. Redding reported to Dr. Tanley that he liked to go fishing. As a result, there is substantial evidence supporting the administrative law judge's conclusion that plaintiff failed to meet Listing 12.05C because he did not have deficits in adaptive functioning.

Plaintiff also maintains that he meets the requirement of Listing 12.05B because he had a valid IQ score of 59 or less. Plaintiff relies on the result of testing that occurred in March 1981. Plaintiff's argument fails because IQ scores over 40 are only valid for

two years when obtained from children between the ages of 7 and 16 years of age. 20

C.F.R. Part 404, Subpart P., Appendix 1, § 112.00.

Plaintiff further argues that the administrative law judge failed to consider the

Dr. Nusbaum's testimony that Redding's conditions met Listing 12.05C and that he did

not understand why Dr. Semmelman considered his IQ tests results to be invalid. As a

Board-certified surgeon, Dr. Nusbaum is not an expert in the area of mental

impairments. Because Dr. Nusbaum is not qualified to determine whether plaintiff met

Listing 12.05C, the administrative law judge was not bound by his opinion.

<u>Treating Doctors' Opinions</u>.  Plaintiff argues that the Administrative Law

Judge erred in failing to consider Dr. Hasan's opinion in its entirety.

<u>Treating Doctor: Legal Standard</u>.  A treating doctor's opinion[1] on the issue of

disability is entitled to greater weight than that of a physician who has examined

plaintiff on only one occasion or who has merely conducted a paper review of the

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.,* the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable."  42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence.   *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004)*; Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v.*

*Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975).  20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."  20 C.F.R. § 404.1527(d)(1).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  *Id.*  Subject to these guidelines, the

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

Commissioner is the one responsible for determining whether a claimant is disabled.  20
C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given
to a treating source's medical opinion unless the opinion is well-supported by medically
acceptable clinical and laboratory diagnostic techniques."  Consequently, the decision-
maker must have "an understanding of the clinical signs and laboratory findings and
what they signify."  *Id.*  When the treating source's opinion "is well-supported and not
inconsistent with the other substantial evidence in the case record, it must be given
controlling weight . . . ."  The Commissioner's regulations further provide that the
longer a doctor has treated the claimant, the greater weight the Commissioner will give
his or her medical opinion.  When the doctor has treated the claimant long enough "to
have obtained a longitudinal picture of your impairment, we will give the source's
[opinion] more weight than we would give it if it were from a non-treating source."  20
C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating
sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without
   some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances
   to medical opinions, *i.e.*, opinions on the issue(s) of the nature and
   severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weigh-ed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion.  Plaintiff argues that the administrative law judge
failed to take into account the length, nature and extent of his treating relationship with
Dr. Hasan. Redding had been treated by Dr. Hasan since August 25, 2006, and he had
seen him seven times through May 28, 2009. Dr. Hasan diagnosed plaintiff with
Brugada syndrome and conducted extensive examinations, prescribed medication, and
ordered further testing. Plaintiff maintains that the administrative law judge failed to
give good reasons for failing to adopt Dr. Hasan's opinion and ignored his statement
that Redding would need to be able to shift positions at will and would require ten to
fifteen minute breaks every three to four hours.

The administrative law judge noted that Dr. Hasan reported a functional
capacity consistent with a range of light to medium exertional work. (R. 106.) Although
Dr. Hasan stated that plaintiff would need to elevate his legs five to ten percent of the
day, the administrative law judge concluded that there was not documentation in the
record to support this assertion. The administrative law judge adopted the opinion of
Dr. Nusbam that plaintiff was restricted to sedentary work. This conclusion was more
restrictive than that proposed by Dr. Hasan. Because Dr. Hasan's opinion that plaintiff
had to elevate his legs at times throughout the day was not supported by the evidence
of record, the administrative law judge was not required to adopt his opinion. Although
Dr. Hasan also opined that Redding required a job that permitted shifting positions at
will and allowed unscheduled breaks every three to four hours for 10-15 minutes at a

38

time, the administrative law judge relied on Dr. Nusbaum's opinion to find that Redding could sit without limitations.

With respect to the remainder of Dr. Hasan's opinion, the administrative law judge rejected his findings because the administrative law judge's residual functional capacity assessment was more restrictive than that of Dr. Hasan. (R. 106-07.) Furthermore, the administrative law judge also noted that Dr. Hasan indicated that Redding was potentially malingering. (R. 107.)

Remand Pursuant to Sentence Six. When the Appeals Council denies a claimant's request for review, the decision of the administrative law judge becomes the final decision of the Commissioner.  *Casey v. Secy. of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).  This Court reviews the administrative law judge's decision, not that of the Appeals Council denying the request for review.  *Id.*  Consequently, only evidence of record before the administrative law judge may be considered by the District Court in reviewing the final decision of the Commissioner of Social Security denying benefits.  *Cline v. Comm'r. of Social Security*, 96 F.3d 146, 148-49 (6th Cir. 1996). A claimant may seek remand so that the evidence presented to the Appeals Council can be considered by the administrative law judge.  *Id.*; *Gartman v. Apfel*, 220 F.3d 918, 922 (8th Cir. 2000).

Section 405(g), sentence six, provides, in relevant part:

> The court may . . . at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and that there is good cause for the

> failure to incorporate such evidence into the record in a prior
> proceeding . . . .

The evidence supporting a motion to remand must be both new and material.  *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996).  Evidence is "new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990)."  *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001).  It is material "only if there is 'a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence.'  *Sizemore v. Secretary of Health & Human Services,* 865 F.2d 709, 711 (6th Cir. 1988)."  *Id.*  Good cause is shown "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Willis v. Secretary of Health & Human Services,* 727 F.2d 551, 554 (1984)(per curiam).  *Id.*  Merely cumulative evidence does not establish good cause for a remand.  *Borman v. Heckler,* 706 F.2d 564, 568 (6th Cir. 1983);  *Carroll v. Califano,* 619 F.2d 1157, 1162 (6th Cir. 1980).  The plaintiff has the burden of establishing that the evidence is new and material and that there is good cause for not having presented the evidence to the Administrative Law Judge.  *Id.*, citing, *Oliver v. Secretary of Health & Human Services,* 804 F.2d 964, 966 (6th Cir. 1986).

Plaintiff seeks remand based on hospital records based on his admission to the Ohio State University Medical Center from August 15, 2009 to August 19, 2009.  According to plaintiff, the records include a tilt table test that was positive for syncope.

During the test, plaintiff's blood pressure dropped from 103/70 to 78/49. Plaintiff argues that these records bolster his credibility because the administrative law judge had concluded that there was no objective evidence explaining his alleged weakness and dizziness.

The medical records show that plaintiff experienced a syncopal episode in his car following his discharge from the hospital. On August 15, 2009, Redding was admitted to the hospital for complaints of a syncopal episode. He reported two episodes of blacking out with a headache over the past two weeks. Prior to fainting, he experienced chest pain that had both a sharp and dull substernal component without radiation, diaphoresis, or nausea and vomiting. His wife reported that his breathing was shallow and that he was pale. Doc. 10 at 48. He reported four recent episodes of syncope. Obinna I. Moneme, M.D performed a neurology consultation. Dr. Moneme believed that plaintiff was describing a stomach syncope rather than a seizure. Dr. Moneme recommended that plaintiff undergo a tilt table test. Doc. 10 at 46.

On August 18, 2009, a tilt table test was performed. He had episodes of syncope with position changes. His blood pressure dropped to 78/49. He was instructed to increase his fluid intake and eat regularly scheduled meals. He was also instructed not to drive for 3 to 6 months. Doc. 10 at 56.

Here, the newly submitted evidence is not material because it is unlikely that the Commissioner would have reached a different disposition of the disability claim if presented with this evidence. Following the test, plaintiff was instructed not to drive.

41

He was directed to drink plenty of fluids and eat regularly. His medications remained unchanged. The results of the test do not demonstrate that he is precluded from all work activity.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v.*

*Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

 s/Mark R.  Abel       
United States Magistrate Judge